Home Docket 2-17-0924, Ronald Lane v. Hyde & Co. Thank you, Mr. Townsend v. William A. Peters v. K. Mahoney Individually and as a group, this is at Magnolia, Oklahoma. Defendants at least. On behalf of Defendants at least, Ms. Rebecca M. Crawford. Thank you, Mr. Simmel. You may proceed. Good morning, Your Honor. Good morning. May I? Sure. You can even argue. Thank you. So I'm not going to go over every single detail of the case, and I will just briefly summarize our argument for Your Honor's, as I'm sure you've read the briefs. So this case arises from dismissal of a legal malpractice complaint. And the underlying malpractice action that is being alleged is Mr. Feda's, Mr. Mahoney and McNamee and Mahoney Law Offices' failure to timely amend their complaint to include additional causes of action. Essentially, there was a motion for summary judgment that was granted in the underlying lawsuit. And 33 days after the motion was granted, they filed a motion for leave to amend their complaint at that juncture. The court stated that they had no jurisdiction because more than 30 days had passed. And that essentially resulted in our clients, Ms. Waynes and Mr. Iacobelli's claims being barred. Even if we agree that that should not have happened, that is an issue that should not have occurred, they should have been more timely, that's not the end all and be all of our discussion, is it? That is not, and precisely so. We agree that in order for us to state a valid cause of action against our client's former lawyers, we need to essentially plead the case within the case. And here we have pled, our position is that we have pled five cases within cases. So there were, in the third amended complaint, there were five causes of action. One for violation of confidentiality act, one for violation of clinical psychological licensing act, consumer fraud act, civil conspiracy and breach of fiduciary duty. Without going into the elements of every single one of the causes of action, based on the review of the record, the key issue is not whether we have pled all of the elements in the underlying causes of action, but whether we have pled the but for element of the cause of action against our client's former lawyers. But don't we also have to look at, don't we have to look at whether your client would have prevailed in this underlying action on any of these enumerated causes of action that you just mentioned, but for the negligence of the defendants? Yes, precisely that. And that's the key issue, how much detail do we have to plead at the pleading stage in order to establish the but for element. So our position is that we have alleged sufficient facts to back up every single element of the underlying causes of action. And viewing those allegations in the light most favorable to our clients, presumably they had those underlying causes of action that they lost. Well, for example, with regard to the allegation with respect to the confidentiality act, mental health and disabilities confidentiality act, isn't the person to whom this information was disclosed, somebody who was authorized to receive it, that is the person at DCFS, wasn't she and weren't there even written authorizations allowed or permitted? Because DCFS, I believe, would have been the guardian. So our position on that is that it's a question of fact, because she's an inter-congee adoption coordinator. The underlying agreement between our clients and the adoption agencies did say that they are authorized to disclose information to anybody involved with processing. But then in parentheses, it gives examples of individuals who are involved with processing of their adoption process. And the specific examples that it provides are translators. And I guess I'm talking specifically about the only possible third-party recipient of the psychological exam would have been Mary Donnelly of DCFS. Correct. She was the one involved in dossier processing or approval. So why was that not authorized under the? Well, the question is, is she really involved in the dossier processing? Because the underlying summary judgment documents show that she merely would have written a letter of recommendation. And so the question of fact is then, what is dossier processing and approval? But could the adoption have proceeded without her letter of recommendation? And that is, I believe that's a question of fact that was never really addressed. Well, if she is this person who is the inter, you said the term correctly, and she is assigned and has knowledge in this area, and she is evaluating this household and this child's well-being, if she recommends that it doesn't happen, that probably would end the proceedings, correct? And she would have to know whatever the issues were at that time. Right. So it appears, based on the facts that we have, that her opinion that the adoption should not have happened doesn't have an impact. But whether her opinion, whether she's the ultimate decision-maker and whether she actually constitutes a person involved in dossier processing such as a translator, that is, I agree that the 2615 motion stage is something that was not properly addressed. Well, I understand why a translator needs to be involved, because we have documents from another government, we have English documents from here. Are you saying that the mere translation of the documents creates sufficient information to go forward with the adoption, even if there are some issues raised? I mean, accurate translations are all that's needed to accomplish this adoption? No, that is not all that's needed. And if I may, just give me a second to pull up the specific definition. So the section that I believe Your Honors are referring to specifically reads, in the underlying contract between our clients and the adoption agency, while this agreement is in effect and or upon termination of this agreement, adoption art agrees to keep all client information confidential with the exception of all third-party involvement in dossier processing or approval. And then it gives examples of who these third parties are. And it says translator, foreign government official, and foreign representative. So it doesn't say that anybody, it doesn't specifically say that inter-county adoption coordinator is that type of third party that's authorized to disclosure without permission from our clients. Is it clear whether or not this woman is an officious interloper? And can Your Honor define what an officious interloper is? Yes. Somebody who has no business being in a given place at a given time on a given day for any given reason, that's an officious interloper. Okay. A busybody. Okay. A nobody. So we go from officious interloper, which is a legal term, to a sine qua non, which is that without which her approval, you don't get a baby. And so where is she on this scale insofar as how authorized is she? Because if she's a sine qua non, it's silly to argue that she's not authorized. Because if she's not authorized to get it, then she probably shouldn't sign the approval, and without the approval, you don't get a baby. So if she's a sine qua non, then your argument fails. So she's either got to be somewhere between a sine qua non and an officious interloper. An intermediary whose letter will have no meaning whatsoever or will have such an insignificant factor that she really shouldn't have been given this information from the get-go. Now, have you alleged in your complaint where she fits on this scale? In the complaint, we have not alleged where she fits on the scale. But we have alleged that the adoption agency defendants have went out of their way to contact her and provide her with information that they misinterpreted from a psychologist to say that our clients were not fit parents. And then once she learned of that information, she disrupted the adoption process. When she interrupted the adoption process, did she do so as an officious interloper, or did she do it as someone who supposedly her statement has some significance? Her statement does have some significance, so I don't deny that. And clearly, in the underlying lawsuit, there are depositions which show that her role was to write a letter of recommendation. And I believe, if I recall correctly, she initially wrote a letter of recommendation for our clients upon initial data. And then once the underlying defendants reached out to her with, in our position, inappropriate information, then she changed her opinion. So I believe that she's a factor in the process. But again, the question is, should the underlying defendant's adoption agency, should they have gone to our client to get their permission first before disclosing this information? And our position is that they should have, or at a minimum, there is at least a question of fact, which should be resolved through further discovery, not at the pleading stage. Apparently, this Ellen Taylor is a deputy director of DCFS who might be responsible for this department of inter-nation. Inter-county adoption. No, that's, I thought that was Ms. Donnelly. This is someone else named Ellen Taylor, who actually did say there will be no adoption here. Ms. Donnelly wrote the letter to her. So she is in charge of inter-country adoptions, correct? She's a deputy director with that authority? Ellen Taylor is one of the defendants who works for the adoption art agency. Okay. Yes. And I believe that her and Alina Filippova, who is also another agent of adoption art, have been our, in our opinion, have conspired and have produced inaccurate information to Mary Donnelly, who is the inter-county adoption coordinator. You claim they violated the licensing act? That's correct. So there was a doctor, Dr. Sherry, who was involved, who prepared a home study on our client. And according to his home study, our client was a fit parent. Ms. Taylor and Ms. Filippova, who are not licensed psychologists, then interpreted Dr. Sherry's opinion and decided that our client is not a fit parent. And then they disclosed that information. When you say interpreted, what do you mean specifically? Are you saying that they took a statement that he made and flipped it on its head? Correct. And if I recall correctly, I believe it had something to do perhaps with them interpreting the way she interacted at home and maybe she had an anger outburst. And they decided based on that that she's not a fit parent. These two people were listed maybe in the arts portfolio or brochure as sociologists or social workers? Social workers. So the act doesn't have a definition section providing a definition for what constitutes a social worker. Our position is that somebody who works in the adoption process and provides services related to the adoption process is a social worker. But they are not licensed psychologists, so our position is they cannot interpret a psychologist's report and provide their opinions based on that. Well, could they have an opinion on that report based upon their own, not on the actual raw data, but on the overall report? Could they have an opinion that could be communicated to an appropriate party concerning the adoption? Not under the Psychological Licensing Act. And the social worker definition, that's more under the Confidentiality Act. And our argument is that it applies to them because they're social workers. But under the Psychological Licensing Act, it's essentially the same as somebody who has no legal license practicing law. And our position is that they were essentially practicing in a psychological field without having a proper license. If I understand your argument taken to its logical conclusion, then the ARC couldn't operate without a licensed psychologist on staff. They could refer, as they did in this case, they could refer to a psychologist. They could serve specific services in order to obtain a report. So in this case, they referred our clients to Dr. Sherry, who prepared the underlying report, which was then misinterpreted by them. Did they ever hold themselves out as psychologists or clinical psychologists? I believe we don't have any issues that they actually held themselves out as psychologists. What you're saying is, so long as the ARC agrees with whatever a psychologist or interviewer, investigator, therapist, whatever, analyst decides, so long as the ARC goes along with that decision, they don't need a psychologist. That's correct, because they are essentially putting together a file for our clients that they could then submit. Well, the point is that implicit in your statement is that you said that they misinterpreted it. So if you misinterpret something, and that's the cause of action, then if you don't misinterpret something, you don't need to be a psychologist. And if you don't misinterpret something, then I think what you essentially argued is that you rubber stamp or adopt whatever the investigator or analyst says in his or her report. Correct. So, you know, here the doctor stated that our clients are fit parents, so they should have taken that, unless there was another doctor stating that they were not fit for some reason. And instead they took his report, they read it, and then they came to their own conclusions, which is something, in our argument, that's something that's reserved for a licensed psychologist. Any other questions? Thank you. You'll have an opportunity to make rebuttals. And just a quick argument, if I may, for our last cause of action is preacher-fiduciary duty. And I think that even if Your Honors decide that there were not sufficient facts applied for the other arguments, I think in this case our strongest cause of action is preacher-fiduciary duty. These individuals were hired by our clients to assist them with the adoption process. And it is something that required our clients to undergo psychological strategies, submit private information. So regardless of what the contract between the parties says, they still have had a fiduciary obligation. So they should have acted in our client's best interest. And before submitting information to third parties, they should have gained proper authority. You said this in your briefs, didn't you? Yes, it was. Okay. Thank you. Thank you, Your Honors. Ms. Rothman, you may proceed. Thank you. May it please the Court. May it please counsel. I can't help to start by pointing out the history of the underlying case insofar as it's significant because it shows that Mr. Feta hardly was lazy in trying to find something that would stick based on the only facts that he had. So initially he filed a complaint for breach of contract, for misrepresentation, for willful and wanton action, for intentional infliction of emotional distress. All of those claims, but the breach of contract claim was dismissed with prejudice based on the facts that were played and based on the law and the elements of those pleadings. When he was left with the breach of contract claim, he went and amended it to include a defamation claim, a false light claim, and a respondeat superior claim. Ultimately, all of these claims were dismissed or were disposed of by summary judgment based on the facts. And plaintiff's legal malpractice claim was based on, obviously, the claim that there was something out there somewhere that my client could have pled. And the bottom line is there was nothing there. And the five causes of action that they've come up with make certain that there's nothing there. Based on the facts that we have that have been pled in the complaint and the facts that you can glean from the underlying motions for summary judgment and the evidence that was offered in those motions for summary judgment, you simply have facts that there is no cause of action that could have been pled for. And certainly not the cause of action that plaintiffs are now claiming my client should have tried to plead after finally losing the last claim on summary judgment. You've got plaintiff entering into a contract for adoption services with AHRQ, AHRQ hiring Dr. Sherry, a clinical psychologist, to evaluate basically what was plaintiff's suitability to be an adoptive parent. This is something the contract required. This is something that the contract between them points out, that they actually, that the plaintiffs need to provide the letter from the psychologist, is I think what the contract says. But in any event, it says, you know, you need a psychologist, and they retain Dr. Sherry to perform this evaluation. And what Dr. Sherry performed was not services rendered for purposes of mental health services. It was a, like a personality test evaluation to evaluate suitability to be an adoptive parent. AHRQ separately, from the psychological component, did a home study, which is something that they do, it's something that they were required to do. And they did a home study, and they approved the home study, and they sent it to the DCFS coordinator, who was a necessary part of this process. And then they got the test results back from the psychologist, Dr. Sherry, and they noted, and this is in the summary judgment papers, they noted a reference in the report to a, quote, probable diagnosis of obsessive-compulsive disorder. They went back and raised that, what they read in the report, to Dr. Sherry. Dr. Sherry then did another evaluation, looked at it again, and said, I can't find, I can't conclude, based on the test results from that certain isolated test, that this person would not be a suitable adoptive parent. And that's what they came back with. So on what basis, then, did the AHRQ refuse to, or pull back its approval of the home study and the adoption? So the AHRQ pulled back their home study adoption based on the communications that it had with plaintiff. Now, I don't think any of these are alleged in the complaint, but based on the day-to-day communications that it had with plaintiff during that home study, after that home study, when she called multiple, and this is all off the record, multiple, multiple, multiple times. Excuse me, you said this is all. This is not, these aren't facts that are, that have been pled. Well, how about what's in the record? So what's in the record is they pulled back their home study because they felt that she was not a fit, not a fit adoptive parent, but they did not approve the home study. So notwithstanding an expert opinion from a psychologist. Correct. They pulled back their opinion. But you have two, you have their home study, and obviously the psychologist's opinion is part of the, part of what they look at, but they approved their home study before they got these test results back to them. So you can't say, well, they waited so they could rubber stamp them. But in any event. So anybody who has obsessive compulsive traits is not fit to be a parent, and a parent, whether adoptive or not? No, I don't, and I think that was what Dr. Sherry pointed out, that Dr. Sherry could not say, well, you're not fit to be a parent because you have these traits. So that's what Dr. Sherry pointed out. So what actions did the attorneys for our plaintiffs here take? The defendants, what action did the defendants take? What actions did the underlying defendants take? They pulled back their study. The defendants here, the attorneys, your clients. My clients, what actions did they take? Yes, when this came, they represented. No, they didn't represent her in the underlying case, in the underlying adoption process. They represented her after the home study was pulled by AHRQ. Okay. After the home study was pulled by AHRQ, plaintiffs came to them and said, I got a claim. You got to find a claim for me to assert, okay? And this is something that's in the underlying record, which is kind of important, is before they pulled their home study and before they disclosed this information that's at issue, which references the OCD, plaintiffs had already gone to another adoption agency, signed up with another adoption agency, paid the $300 for the home study, and they were pursuing another adoption agency to get their home study. And under the contract, there was no other, no relationship, because to the extent that they're not exclusively doing this with AHRQ, I believe the contract, you know, it is a termination of their relationship. So that's important, and I think it was important in the underlying case because there were no damages. So contrary to the allegations in plaintiffs' complaints. Was the other adoption agency approved? I believe it did. Now, those aren't facts that are in the record. I believe they did, but those aren't facts that are of record in this, or at least what's in front of you in this case. How were your clients not negligent? My clients were negligent. They missed that deadline. They discussed with their clients whether it was worth pursuing. They thought it wasn't worth pursuing. They ended up filing. If you look at the motion for amended complaint they filed, there was nothing attached to it that said these are the claims we're going to file. They didn't file that motion to amend the complaint because they thought that there was something else out there that they could have pled that they whiffed on, and they didn't plead the first seven times. But they absolutely are negligent in the fact that they failed to meet that deadline. Does that mean it's malpractice? No, because that goes back to the proximate cause and the but-for cause of damages. And in this case, I think if you look at the complaint, there is no question that based on the facts from the complaint and the underlying case, none of these claims could stand. They were not viable. The Mental Health Act claim and the Clinical Psychological Licensing Act, neither one of those acts applies. This was not, you know, just a simple reading of those statutes showed that those were intended for much different circumstances. The Mental Health Act was intended to protect records from treatment, mental health treatment. There is a case that is not cited in our briefs, but it is, I guess the central district explains it probably better than we did in our briefs, why neither one of these acts applies. And it is the Cary Carter v. Rent-a-Center case, 316 F sub 2D 675, where the central district, that was in 2005, looked at a situation where you've got an employer who mandates personality tests for employees that are going to apply for managerial positions. Takes the test, they look at the test, they interpret the results, and they either, you know, give them the job or they don't give them the job. Plaintiff and a class of plaintiffs brought claims against the employer under the Mental Health Act, under the Licensing, Psychology Licensing Act, and the court looked at that and just like we've argued in our briefs, said these don't apply here. These are not the circumstances under which these acts apply. So I think there, you know, if you read the statute and you read what's going on and you read the facts, those acts, there's no reasonable argument that those acts apply to this case. With respect to the conspiracy claim, I mean, if you look at it, this wasn't argued, but if you look at the conspiracy claim, there are no facts in there that plead that there was agreement between ARC or ARC's employees or ARC and DCFS or ARC and anybody else that they didn't want to give this woman, you know, a chance to adopt a baby. But what about the breach of fiduciary duty claim? I don't think the facts speak to a breach. You've got a contract claim, you've got a contractual relationship, but certainly there's no facts in here that would suggest that you've got circumstances or a relationship that rises to the level of a fiduciary. In attorney, some of the other fiduciary relationships are attorney-client, doctor-patient. There's all a responsibility by the attorney to look after the client's rights, the doctor to look after the patient's health. Who, the ARC, is it responsible to the plaintiffs here or to the people it contracts with, or are they ultimately responsible to the children they're going to place? I would say all three, and I would say, and I don't have, and I'm not sure I can point to anything in this contract, but their role is to shepherd potential parents through this adoption process and to coordinate with them through this adoption process. And it is governed by a contract that says, you know that we need to do this. You know that these things will be disclosed to foreign countries and agencies that we need to show these things to to help you adopt this child. So with respect to the disclosure of this information, number one, it didn't impact. There's no allegation, you know, that there's summary allegations that it sabotaged her right to obtain a child. That's wrong. That's wrong based on the underlying summary judgment pleadings wherein the Ms. Donnelly says, or plaintiff says, you know, no, I contracted with this other agency. You know, yes, before that letter was sent, I had already contracted with them because, you know, maybe she knew she wasn't going to get a positive home study with the way that they had interacted. What kind of damages are available for these multiple children? I don't think there's any as a matter of law or based on the facts. What do you believe is the maximum amount of damages? Is it the cost of the second agency's machinations? No, because she did that before this disclosure was even made. So she incurred those costs all on her own before the disclosure was ever made. They didn't disclose what is purportedly an issue until after this woman had already reached out and paid that fee. So it couldn't possibly be related to that. I don't think there's any damages. I think you've got no damages. And you certainly don't have a but-for cause of damages. We don't have a lot of the record from the underlying act. I saw that yesterday when I was interviewing. We have pleadings. We have a couple of pleadings. We have one of the complaints. Once we have a motion for summary judgment, it's really hard for us to know exactly what happened at that level without certain other exhibits. And the ones that we do have, candidly, are a little hard to read. I'm not saying that you have a responsibility to make sure the copier is working. But how can we look at it? I mean, this record was sizable in itself. But how do we deal with trying to figure out what happened at that trial court and then sort of put this on top of, you know, put what happened and then put this lawsuit on top of it? Right, because you've got two kind of levels here. In preparing for this, I looked at what was in the record, which is the motion for summary judgment, which was attached to our pleadings, our past motions for summary judgment, as exhibit F. And it's C-419. You never did your appendix. I do not. C-419 to C-413. And that actually is a very legible copy from those records. But if we're trying to find out if mistakes were made by Mr. Fetta as he presented this. Well, my response to that is that's not a legitimate complaint. There's no allegation of negligence that speaks to him not properly arguing the facts that were plot. They didn't argue that. What they're arguing, they're conceding that, okay, maybe we don't have these claims. Maybe we couldn't state a claim under all of those. But here's five more that I think we can make. So they don't claim anything about what we did. You're saying they didn't appeal from the dismissal of all the prior claims? Correct. Correct. Any other questions? Thank you. Time is up. Mr. Simaldo, you may proceed. Thank you. Yes. And I think your Honor focused on exactly the right issue. Your Honor said that there is not enough records from the underlying case. And those are the records that counsel is relying on to attack our client's pleading. And so essentially what they're trying to say is they're trying to make a 2619 argument rather than a 2615 argument. And they're saying that our client's claims are barred based on the decisions of the underlying 2009 lawsuit. However, they don't point with specificity to any specific rulings in that case or any specific facts. And the way Judge Clancy Boyle in the circuit court ruled is on a 2615 standard. And it was because her position was that our clients have not pled the but-for element of a legal malpractice cause of action. So the real issue is how do you plead the but-for element? Our position is that all you need to do is set forth the elements for a viable cause of action and demonstrate how that viable cause of action was lost as a result of the attorney's negligence. And whether that cause of action was ultimately viable or not is a question of fact that should be addressed, more properly addressed at trial. So are you saying that the statement that your client went and got or retained in the second agency is not on record? It's not. It wasn't alleged. And I don't recall that argument even ever being made in opposition or in defendants' attempts to dismiss any of the underlying complaints. What exactly are the damages that you're seeking? So the damages would be the amount of money and time that our clients have spent, expended on the services and also potentially punitive damages as a result of intentional actions of the ARC defendants in misinterpreting the data and breaching their fiduciary duties to our clients. What is the fiduciary duty that is owed in this case? So in this case, as counsel submits, their duty was to shepherd, our defendant's duty was to shepherd our clients through the complicated adoption process and to help them ultimately adopt a child. And so their duty was to act in our client's best interest. Do they violate, I mean, if, let's just assume for this discussion that there is a duty, would they have violated that duty if Pakistan decided not to allow any other adoptions at a certain date, just cut it off because they had a bad experience with some foreign country? No. No, that's outside of their control. But our position is that they violated that duty because they, on their own initiative, went outside of their role, interpreted psychological raw data, and caused our clients to lose the ability to adopt a child from Pakistan. If Pakistan does something independently of our defendant's actions, they haven't done anything. So that's something that they couldn't control. Just like an attorney representing a client, we owe fiduciary duties to our clients. And we also have some ethical obligations. We can't go against the code of ethics on certain issues. So it's a constant balancing act between what we owe to our clients and what our ethical obligations are. In this case, it's a similar situation. They still owe a fiduciary duty. They may owe some type of a duty to the child that is ultimately being adopted because obviously a child cannot be placed in a bad home. They need to make sure that the child is secure. But the allegation, or the case within a case that we pled, is that they intentionally went against a doctor's recommendation and created their own conclusions. And it ultimately resulted in our client not being able to adopt a child. Dr. Sherry's first recommendation, the first time he wrote his report, he did note that there were some characteristics of obsessive-compulsive disorder. Did he not? I do not believe he specifically said that there were, and at least I don't recall seeing that anywhere where he specifically said that there are characteristics of obsessive-compulsive disorder. I believe that is something that came from the part of defendants. But his ultimate decision was, in the first report and then ultimately the second report, I don't see anything that would stop Ms. Lane, I believe is the person, from being a good parent, correct? That's correct. Yes. His ultimate conclusion was that she was a fit parent. What if, and again, we don't know this because we don't have that part of the file, I don't think. What if the ARC has certain guidelines by which they operate that indicate if there is any evidence whatsoever of a disorder, that they will not then continue to shepherd the psychological disorders, they will not continue to shepherd the adoption? Then there would be an affirmative defense that they would have had to specifically identify in their motion to dismiss where here they were saying. Well, it was a motion for summary judgment. That's under, in the 2009 case. Correct. The defendants in this case are filing a 2615 motion to dismiss, and they haven't specifically pointed to any such affirmative matter. It's merely, their arguments in the 2615 motion is that we have not planned a cause of action, Well, how would they have access to that information? Because they don't represent the ARC. They don't. Would they make them parties? No, but their client represented our clients in the underlying action, so he has the access to all of the pleadings, the rationale behind why he made certain arguments. He may even know why the, he may have better knowledge as to why the motion for summary judgment was granted or not granted, but even Mr. Feta, even he did think that there might be a potential to amend the complaint, because he ultimately did file a motion for leave to amend the complaint, but his mistake was that he filed it more than 30 days after the motion for summary judgment. Did he attach the amended complaint to the motion? I believe he did, and the causes of action that he attempted to assert. Yeah, I'm sorry, I don't have that information, but I believe he did attach it. Are they different from what you allege? Yes, they are. They are different, but our position is that he could have still asserted the breach of fiduciary duty, Well, are you saying, then, that the amended complaint that was filed was meritless, because if it had any merit and it was late, then wouldn't you be citing those counts in your complaint? I don't have an opinion as to whether his complaint was meritless or not, but our position is that he could have still, within 30 days, he could have still amended the complaint to include certain causes of action that were not raised in the underlying lawsuit. And as for the case that counsel raised regarding the Licensing Act and the Confidentiality Act, I have not had an opportunity to read that case, and it was not cited in any of the rules. Okay, thank you. Your time is up. We're done asking questions. There will be a short recess.